UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:13-CR-78-TLS |
| | ) | |
| MARVIN L. BENNETT | ) | |

**OPINION AND ORDER**

This matter is before the Court on Defendant Marvin L. Bennett's Motion to Suppress [ECF No. 18], filed on March 28, 2014. In his Brief in Support of Defendant's Motion to Suppress [ECF No. 26], the Defendant argues that the stop of his person, as well as the subsequent search by police officers, violated his Fourth Amendment rights. The Government responds that the stop was based upon specific and reliable information about an incident involving a gun. The Government asserts that the evidence was seized pursuant to a valid search incident to an investigatory detention. For the reasons set forth in this Opinion and Order, the Court will deny the Defendant's Motion.

**BACKGROUND**

By way of an Indictment filed on November 20, 2013, the Government charges that, on October 21, 2013, the Defendant knowingly possessed in and affecting commerce a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). On March 28, 2013, the Defendant filed a Motion to Suppress, requesting that the Court suppress evidence that law enforcement officers obtained from his person on October 21, 2013, when they stopped him for an investigatory detention.

On May 1, 2014, the Court conducted an evidentiary hearing on the Motion to Suppress.

The Defendant was present and represented by attorney Michelle F. Kraus. The Government was represented by Assistant United States Attorney Lovita Morris King. The Court granted the Defendant's motion to separate the witnesses. The Court heard testimony from Fort Wayne Police Department Officers Daniel Amos and Kimberly Seiss, and Ada Grosjean. Several exhibits were also admitted into the record. At the conclusion of the hearing, the Court took the Motion under advisement and gave the parties additional time to file briefs. The Defendant and the Government have filed briefs for this Court's consideration, and the matter is ripe for ruling.

**FINDINGS OF FACT**

Upon consideration of the credibility of the witnesses and the examination of the evidence, the Court makes the following findings of fact.

On October 21, 2013, at 10:52 AM, the City of Fort Wayne and Allen County emergency call center received a 911 call reporting a disturbance involving gun shots in a high crime area. (Tr. 6-7, 42, 68; Govt. Ex. 1.) The caller provided his name and address, the location of the disturbance and a description of the suspects. (Govt. Ex. 1.) The emergency call center dispatched this information to the Fort Wayne Police Department (FWPD). (Govt. Ex. 2.)

FWPD Officer Daniel Amos was dispatched to the area of Baxter and Gaywood Street, the reported location of the incident. (Tr. 9 – 10.) Officer Amos arrived to the reported location around 10:56 AM. (Tr. 43.) He surveyed the area in an attempt to locate a white colored vehicle with tinted windows, which was reportedly shot at, but was unable to locate the vehicle. (Tr. 14.)

While surveying the area, Officer Amos passed three males standing at the intersection of Baxter and Gaywood Street. (*Id.*) None of the three males appeared suspicious or attempted to

2

flee. (Tr. 30 – 31.) Officer Amos, recognizing one of the males as an acquaintance nicknamed "House," asked the man if he had seen or heard anything. (Tr. 14 – 15, 28.) He replied "No" and Officer Amos continued on. (Tr. 15.)

FWPD Officer Kimberly Seiss and Officer Addison, while on duty and riding together in a police vehicle, received the dispatch and responded as backup at 10:53 AM. (Tr. 46 – 48.) Officer Seiss heard the following description of the suspects: four black males and one black female on foot; teenagers between the ages of 16 and 19; the female was wearing flowered pants; one of the males was wearing camouflage pants; and one of the males was wearing an "Elmer Fudd-type" hat.[1] (Tr. 48.)

After arriving in the area of Baxter and Gaywood Street, Officers Seiss and Addison also located the three males standing at the intersection of Baxter and Gaywood Streets. (Tr. 49.) The officers concluded that two of the males matched the description provided by dispatch. (*Id.*) They then contacted and met up with Officer Amos. (*Id.*) Officer Amos believes he met Officers Seiss and Addison at South Park, located one block away and outside the three suspects' line of sight. (Tr. 33.) Following a discussion with Officers Seiss and Addison, along with a review of the call comments,[2] Officer Amos realized that two of the three males he had spoken to matched the description provided by dispatch. (Tr. 32, 49.)

All three officers returned to the intersection of Baxter and Gaywood Street at 11:00 AM. (Tr. 16 – 17.) The three males, including the Defendant, were still standing in the same

---

[1] Officer Amos described an "Elmer Fudd-type" hat as a "winter hat with flaps on the side and the fur on it." (Tr. 16.)

[2] Officer Amos' police vehicle contained a screen that permitted him to read information transmitted by Officers Seiss and Addison. (Tr. 15, 60.)

location. (Tr. 34.) The Defendant was a black male wearing camouflage pants and one of the other suspects was a black male wearing an "Elmer Fudd-type" hat. (Tr. 30.) Officer Seiss testified that none of the males appeared to be between 16 and 19 years of age. (Tr. 67.) And none of the suspects appeared suspicious or attempted to flee. (Tr. 30 – 31, 34.)

All three officers then exited their vehicles and approached the suspects. (Tr. 33 – 34.) None of the officers had a weapon drawn. (Tr. 34 – 35.) Officer Amos testified that the Defendant and the other two males were lined up across from the three officers at arms-length. (Tr. 19, 38.) Officer Amos, who approached and was standing across from the Defendant, told the Defendant that the officers received a dispatch reporting gun shots, and that the Defendant and one of the other suspects matched the description provided. (Tr. 35 – 36.) Officer Amos then asked the Defendant if he was carrying any weapons. (Tr. 18.) The Defendant responded by stating, "I'm dirty." (*Id*.) Officer Seiss testified to hearing Officer Amos' question and the Defendant's response. (Tr. 51.) Officer Amos testified that, based on his experience—six-and-a-half years as a FWPD officer—he believed the Defendant's response indicated that he was carrying drugs or a weapon. (Tr. 8, 18.) Officer Seiss also testified that the Defendant's response indicated that he was carrying an illegal item. (Tr. 52.)

Officer Amos then told the Defendant that a pat-down search was necessary for the officers' safety. (Tr. 18.) The Defendant consented to the pat-down search. (*Id*.) While patting-down the Defendant's outer clothing, Officer Amos felt a hard item in the Defendant's right-pocket and saw a weapon handle poking out of the pocket. (Tr. 18 – 19.) Officer Amos alerted the officers to the weapon on the Defendant and proceeded to grab the Defendant's wrists to prevent him from grabbing the weapon. (Tr. 19.) The Defendant did not attempt to grab the

4

weapon. (*Id.*) Officer Addison assisted Officer Amos, and the officers removed the weapon, a revolver handgun loaded with .22 caliber bullets. (Tr. 20 – 21.) After the officers took custody of the Defendant and continued to conduct a protective pat-down search, they also found marijuana and additional .22 caliber bullets on the Defendant's person. (Tr. 21 – 22, 53.) Officer Addison reported the weapon to dispatch at 11:07 AM. (Tr. 22.)

Police reports were subsequently filed by Officers Amos and Addison. (Tr. 25, 56.) Officer Seiss did not file a police report because she was accompanying Officer Addison. (Tr. 56.) Officer Amos' police report, in part, stated, "I approached [the Defendant] and asked him if he had any weapons." (Tr. 36.) Officer Amos' statement to the Defendant as to why he was conducting an investigatory stop was not included in the police report. (*Id.*) Officer Addison's police report stated, "Officer Amos approached the male black wearing the camouflage pants, Marvin Bennett, and patted him down for weapons for his safety." (Tr. 64.) Officer Amos' statement to the Defendant as to why he was conducting an investigatory stop and his question as to whether the Defendant was carrying a weapon were not included in Officer Addison's police report. (*Id.*)

Officer Amos testified that, after the Defendant was taken into custody, the Defendant stated the following: "It's over. I'm done. I'm a multiple felon. It's over. I'm done. I'm a multiple felon," and "I'm going to be gone for a long time." (Tr. 22.) According to Officer Amos, the Defendant repeated these statements "over and over again." (Tr. 22, 39.) Officer Seiss testified that she heard the Defendant make these statements. (Tr. 70.)

Ada Grosjean, a witness to the incident, testified for the Defendant. (Tr. 72 – 90.) Grosjean said she lived at the intersection of Baxter and Gaywood Street at the time of the

5

disturbance. (Tr. 72 – 74.) Grosjean said she grew up and went to church with the Defendant. (Tr. 73.) The Defendant also maintained an existing friendship with Grosjean's boyfriend, Ionday (Tr. 85 – 85.) Grosjean testified that on October 21, 2013, around 10:30 AM, she heard gun shots while outside her home. (Tr. 74, 85.) Grosjean said she saw approximately seven teenagers walking down Baxter Street. (Tr. 74.) Grosjean testified to seeing two of the teenagers pull firearms out of their waists and shoot at a vehicle heading down Baxter Street. (*Id.*) Grosjean could not recall the type or color of the vehicle. (Tr. 74 – 75.)

Grosjean testified that upon returning inside her home, the Defendant arrived to her home on his bicycle. (Tr. 75.) Grosjean said she allowed the Defendant into her home and informed him of the incident. (*Id.*) Grosjean stated that Ionday and "House" then pulled up to her home in a silver-colored vehicle, and that she and the Defendant moved from the porch to the sidewalk. (Tr. 76 – 77.) Grosjean testified that Ionday and "House" exited their vehicle, and that Grosjean, Ionday, "House" and the Defendant spoke for a couple of minutes before they were approached by the three officers. (Tr. 77.) According to Grosjean, the officers remained in their vehicles while "House" and a male officer spoke. (Tr. 78.) Grosjean said she told the officers that teenagers fired the gun shots and then ran down an alley. (*Id.*) She stated that the officers then drove to South Park, but then turned around, within her line of sight, and came back to the sidewalk where the four of them were standing: three males on the sidewalk and Grosjean in her yard. (Tr. 78 – 80.)

According to Grosjean, all three officers exited the vehicles and approached the three males on the sidewalk. (Tr. 80.) She stated that the officers proceeded to search the Defendant, without any words spoken between the officers and the suspects; and if there were words spoken,

6

she was close enough to hear them. (Tr. 81 – 82, 87.) Grosjean stated that the officers recovered a firearm from the Defendant's person. (Tr. 82.) Grosjean said she did not recall the Defendant making any statements after the gun was found. (Tr. 87.) According to Grosjean, as the Defendant was being arrested, she attempted to notify the officers that the Defendant was not engaged in the shooting, but the officers told her to return to her home. (Tr. 88.)

Both Officers Amos and Seiss testified that they had never seen Grosjean before. (Tr. 92, 96.) Officer Amos stated that, although there were other people in the area, he did not recall any female coming up to either him or the other officers after the Defendant was arrested. (Tr. 92.) Officer Amos also testified that no one informed him of seven teenagers at the scene of the disturbance. (Tr. 94.) Officer Seiss also testified that she did not remember talking to any other people at the time. (Tr. 96 – 97.)

## CONCLUSIONS OF LAW

The Fourth Amendment protects the right of "the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. An investigatory stop—a brief, non-intrusive detention—is a seizure within the meaning of the Fourth Amendment. *United States v. Scheets*, 188 F.3d 829, 836 (7th Cir. 1999).

Police officers are justified in conducting a brief investigatory stop if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "A *Terry* investigative stop 'gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or about to be engaged in criminal activity.'" *United States v. Bullock*, 632

7

F.3d 1004, 1014 – 15 (7th Cir. 2011) (quoting *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995)). Although reasonable suspicion requires more than a mere "hunch," it is a measure of suspicion less demanding than that required for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). It is a "commonsense, nontechnical" concept dealing with "the factual and practical consideration of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (internal quotations marks omitted).

The Defendant argues that the evidence against him should be suppressed because the officers "did not have reasonable suspicion that [the Defendant] was involved in criminal activity." (Mem. in Supp. of Mot. to Suppress 7, ECF No. 26.); *see United States v. Conrad*, 673 F.3d 728, 732 (7th Cir. 2012) ("the Supreme Court has long recognized the need to exclude evidence obtained in violation of the Constitution's protections.") (citing *Weeks v. United States*, 232 U.S. 383, 398 (1914)).

The Government counters that the officers had reasonable suspicion to approach the Defendant and ask questions because the Defendant generally matched the description of a reported suspect and was found standing with another individual who generally matched the description of a reported suspect. (Br. in Opp'n of Mot. to Suppress 11 – 12, ECF No. 27.) The Government also argues that a protective pat-down search was necessary because the officers can point to articulable facts establishing reasonable suspicion that the Defendant was carrying a weapon or posed some danger. (*Id*. at 12.)

Based on the totality of the circumstances, the Court finds that the officers had reasonable suspicion to conduct an investigatory stop and pat-down search of the Defendant.

8

## A. Investigatory Stop

To determine whether an investigatory stop was reasonable, a reviewing court must examine: "(1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and (2) whether the degree of intrusion was reasonably related to the known facts." *United States v. Tilmon*, 19 F.3d 1221, 1225 (7th Cir. 1994). The "reasonable suspicion" test is objective and based on the totality of the circumstances known to the officer at the time of the stop. *United States v. Amaral-Estrada*, 509 F.3d 820, 827 (7th Cir. 2007).

The police investigation in this case was prompted by a 911 emergency call from an eyewitness. In general, eyewitness accounts of an ongoing emergency "do not need corroboration, or a history of other accurate reports, to be believed." *United States v. Woods*, 551 F.3d 647, 649–50 (7th Cir. 2008); *see also United States v. Drake*, 456 F.3d 771, 775 (7th Cir. 2006) (the court should presume the "reliability of an eyewitness 911 call reporting an emergency situation for purposes of establishing reasonable suspicion, particularly when the caller identifies herself"). Additionally, an officer may consider the information reported by an identified 911 caller to a dispatcher and conveyed to officers. *Drake*, 456 F.3d at 774 – 75. Here, the caller provided his name, address and a contemporaneous eyewitness report of an ongoing emergency. The reported information was then dispatched to the officers who responded to the reported emergency. Because the 911 caller provided his name, address, and a specific description of both the location and suspects involved, it was reasonable for the police to rely upon the eyewitness report as reported by dispatch.

Relying upon the eyewitness description of the suspects, as conveyed by dispatch, the officers identified the Defendant and another male suspect that generally matched the eyewitness

9

description. Specifically, the Defendant was a black male wearing camouflage pants and the other male suspect was wearing an "Elmer Fudd-type" hat.

The Defendant argues that the officers lacked reasonable suspicion because the Defendant and the other male suspects did not attempt to flee or exhibit any suspicious behavior. But despite the fact that the Defendant and the other suspects did not appear suspicious, the officers' suspicion arose from other key facts; namely, the Defendant and another male suspect generally matched the eyewitness description, they were standing at the location of the disturbance—the area of Baxter and Gaywood Streets—and they were identified within 10 minutes of the 911 call. *See United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) (holding that "police observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch"); *see also United States v. Hicks*, 531 F.3d 555, 558 (citing to *Lenoir* for the proposition that "[u]nder most circumstances, when an officer observes someone who fits the description given by a dispatcher of a person involved in a disturbance, the officer may stop the suspect"). On these facts, the officers were justified in believing that the Defendant was one of the suspects reported by the 911 caller.

Furthermore, the stop effectuated by the officers otherwise fell within the limits imposed on *Terry* stops. During their investigatory detention, the officers were entitled to ask the Defendant "a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). Importantly, the officers were also permitted "to take reasonable steps to insure their own safety." *United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002). In doing so,

10

Officer Amos was entitled to notify the Defendant of the reason for the investigatory stop—investigating a reported firearm incident involving suspects matching the Defendant's description—and to insure the officers' safety by asking the Defendant whether he was carrying a weapon. Accordingly, the degree of intrusion resulting from the investigatory stop was reasonably related to the known facts.

The Court finds that, based on the totality of the circumstances, the officers had reasonable suspicion to conduct a brief investigatory seizure of the Defendant.

**B.     Search of the Defendant**

When an individual is stopped by a police officer, this incident can potentially involve two stages: (1) the actual stop itself; and (2) a protective pat-down search. *United States v. Brown*, 232 F.3d 589, 592 (7th Cir. 2000). Such is the case here. The Court has already determined that the initial stop was justified because the officers had a reasonable suspicion supported by articulable facts that the Defendant may have been engaged in criminal activity. The Defendant argues that even if the initial stop was justified, the pat-down search was not. The Defendant contends that Officer Amos observed nothing that would lead him to believe that his safety or the safety of others was at risk.

Whenever the circumstances of an on-the-street encounter are such that a police officer reasonably believes he may be dealing with someone who is armed and dangerous, the officer is justified in conducting a pat-down search of that individual for weapons for his own protection, and for that of others nearby. *Terry*, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* Addressing

11

the objective aspect of the court's analysis, the Seventh Circuit has warned: "It is important to remember that we are not limited to what the stopping officer says or to evidence of his subjective rationale; rather, we look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious. *United States v. Ford*, 333 F.3d 839, 843 (7th Cir. 2003) (citing *Brown*, 232 F.3d at 594).

Here, Officer Amos testified that, after asking the Defendant whether he was carrying a weapon, the Defendant responded by stating, "I'm dirty." Officer Seiss confirmed the accuracy of Officer Amos' testimony. Officers Amos and Seiss both testified that according to their experience, the Defendant's statement indicated that he was carrying a weapon or an illegal item. Combined with his knowledge of the recurrent criminal activity in the Baxter and Gaywood neighborhood, Officer Amos believed a protective pat-down search was necessary. *See Jackson,* 300 F.3d at 746 (holding that police may take into account whether a location is a "high crime area").

The Defendant challenges the accuracy of Officer Amos and Seiss' testimony related to the immediate events prior to the protective pat-down search. Specifically, the Defendant points to certain omissions in the police reports filed by Officers Amos and Addison, respectively, contending that Officer Amos did not communicate the reason for conducting the investigatory stop or ask the Defendant whether he was carrying a weapon before conducting the search. Although Officer Amos' police report stated, in part, "I approached [the Defendant] and asked him if he had any weapons," it omitted Officer Amos' explanation to the Defendant as to why he was conducting an investigatory stop. Officer Addison's report does not reference either Officer

Amos' explanation or question posed to the Defendant. But despite these omissions, nothing within either report directly contradicts the testimony of Officers Amos and Seiss. The reports simply omit certain details of the encounter between Officer Amos and the Defendant.

The Defendant's only evidence that directly contradicts the testimony of Officer Amos and Seiss is the testimony provided by Grosjean. According to Grosjean, the officers conducted a protective pat-down search without any words spoken between the officers and the Defendant immediately prior to the search. In addition to several inconsistencies between Grosjean's testimony and the testimony provided by Officers Amos and Addison, the Court notes that both testifying officers said they had never seen Grosjean before. Officer Amos also stated that, although there were other people in the area, he did not recall any female coming up to either him or the other officers after the Defendant was arrested. Officer Seiss also testified that she did not remember talking to any other people at the time.

In light of the testimony presented, the Court does not find Grosjean's testimony to be convincing. The Court credits the testimony of Officers Amos and Seiss; specifically, that Officer Amos asked the Defendant whether he was carrying a weapon and the Defendant provided a response that reasonably indicated—based on the experience of Officer Amos and his knowledge of the recurrent criminal activity in the Baxter and Gaywood neighborhood —that the Defendant was carrying a weapon or an illegal item.

Based on the totality of the circumstances, the officers had reasonable suspicion to conduct a protective pat-down search of the Defendant.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's Motion to Suppress [ECF No. 18]. A Telephone Final Pretrial Conference is **SET** for November 4, 2014, at 10:00 AM before Judge Theresa L. Springmann. The Court will initiate the call. A three (3)-day Jury Trial is **SET** for November 18, 2014, at 8:30 AM before Judge Theresa L. Springmann.

SO ORDERED on October 22, 2014.

s/ Theresa L. Springmann  
THERESA L. SPRINGMANN  
UNITED STATES DISTRICT COURT